THE STATE OF OHIO, APPELLEE, *v.* WATSON, APPELLANT.

[Cite as State v. Watson, 20 Ohio App. 2d 115.]

116

(No. 29102—Decided October 23, 1969.)

*Mr. John T. Corrigan*, prosecuting attorney, *Mr. Henry Szemer* and *Mr. Harvey Monck*, for appellee.

*Mr. Edward R. Brown* and *Mr. Elmer A. Giuliani*, for appellant.

DAY, J. The defendant was convicted on two counts of murder one: murder in the first degree, Section 2901.01, Revised Code; and, taking life of police officer, Section 2901.04, Revised Code. Each conviction carried a mandatory death sentence absent a recommendation of mercy. There was no recommendation.

The defendant appealed, noting five assignments of error:

"I. The trial court erred in admitting evidence, over defense objection, of two other assaults and robberies, both of which were purportedly committed by the defendant within three weeks of the slaying of Patrolman Huber, for

the purpose as specified by the prosecution of establishing the murder weapon in the possession of the defendant at the time of the slaying when this element of proof had already been established by the prosecution without such evidence of other crimes and when this element was never disputed by the defense.

"II. The trial court erred in refusing to grant defendant's motion for mistrial or in failing to take other corrective action to eradicate the prejudice caused to the defendant by the prosecution's comment in closing argument respecting matters which had previously been properly excluded by the court.

"III. The trial court erred in sustaining the prosecution's challenge for cause, over defense objection, to eight prospective jurors and one prospective alternate because of either their general opposition to capital punishment or their expressed doubt and hesitation about their ability to return a verdict carrying the death penalty in this case without further inquiry whether this general opposition or doubt was tantamount to an automatic rejection of the death verdict in any case.

"IV. The trial court erred in refusing to grant defendant's motion for mistrial or in failing to take other corrective action to eradicate the prejudice caused to the defendant by the prosecutor's demand for the death penalty in closing argument coupled with their representation that they had never before overtly made such a demand in over forty years of trying cases and in over 800 other murder cases.

"V. The trial court erred in overruling defendant's motion to suppress his in-custody statement made to a press reporter on the grounds that the questioning leading to this statement was not initiated by law-enforcement officers without first determining whether defendant's statement to the press reporter was in any way influenced or tainted by earlier in-custody statements to law-enforcement officers."

All assignments of error have been carefully considered in conjunction with the record in this case.

## I

The first assignment of error raises the propriety of introducing evidence of other, unrelated crimes attributed to this defendant in order to prove his possession of the weapon used to perpetrate the crime for which he was on trial. The defense made a seasonable objection to the use of the testimony of victim Peter Ashcroft[1] on the ground that it was inappropriate under the "like and similar act" doctrine (see Section 2945.59, Revised Code) and "highly prejudicial toward the rights of the defendant." The record reflects a response by the state, which narrowed its purpose in submitting the evidence to avowed objectives having nothing to do with the "similar act" concept:

"Mr. Szemer: Your Honor, at this stage of the proceedings, at issue is the possession of the gun, which has been marked for identification[2] as an exhibit.

"The prosecutor feels that it is relevant. All evidence is relevant to the ownership and possession of this gun, and their witness will testify he had the gun until April, but from April to May 11th he did not have possession. It was his gun and he was not in the vicinity of 89th and Superior.[3]

"We feel it is relevant in this case now to show possession of this gun.

"The Court: Do I understand is the prosecutor telling the court the purpose of this witness testifying is he will identify this weapon that is an exhibit in this case as *previously being his weapon?* [Emphasis added.]

"Mr. Szemer: That is correct, your Honor.

"The Court: Does the prosecution intend to tie this weapon in with the defendant?

---

[1] There was testimony by two such witnesses involving separate incidents. The claims for it and objections to it were identical in all particulars except as noted in footnote 4, *infra*, in connection with an additional purpose suggested by the state.

[2] State's Exhibit 16. In fact, state's Exhibit 16 already had been received in evidence. (R. 1138) (see pages 119, 120 and 121, *infra*.) (All "R" references in this opinion are references to the bill of exceptions and are followed by relevant page numbers.)

[3] The location of the crime for which defendant was on trial.

"Mr. Szemer: Yes, your Honor.

"The Court: Then the objection is overruled."[4]

Whatever justification the previous-acts evidence may have had in relation to possession of the gun, it was obliterated by earlier testimony by the state's own witnesses, Police Officers Donald Bagnell and Paul McHugh. The gun in question, state's Exhibit 16, had been admitted during Bagnell's testimony prior to witness Ashcroft's testimony (R 1138).

[4]It has been noted above that this dialogue referred to the witness Peter Ashcroft. At a later time when the victim of the second episode, Harold Kelly, was presented as a witness an objection elicited the following colloquy:

"The Court: Do I understand that you are confining your questions of this witness solely to whether or not he can identify this weapon, and that he can further identify that the defendant in this case had this particular weapon?

"Mr. Szemer: That is correct. That is correct, associating this weapon with the defendant. Whether it be a criminal act, whether it be a justifiable act, is not the issue in this matter. Under the circumstances it is just connecting this weapon with the defendant. That is the purpose of the introduction of this testimony.

"Mr. Monck: Also, there is evidence in here that he had injuries to his face, and we may get some of that in here too. This man knocked him off his truck." (R 1454-1455)

Doubtless Mr. Monck's reference at this point was to evidence of facial injuries elicited from previous state witnesses on cross-examination. Initially, at least, this added justification was assigned light weight by the trial court. For, in overruling a defense motion for mistrial one page in the record after Mr. Monck's statement, the trial court said:

"The court is overruling your motion for mistrial. The court is aware of the fact that the prosecution has called to the court's attention that the purpose of this witness testifying is to show that this witness can identify this weapon, and that he can identify this defendant as having the weapon on this particular day.

"Is that what I understand, Mr. Prosecutor?

"Mr. Szemer: That is correct.

"Mr. Monck: Yes." (R 1456-1457)

However, at a still later point when the defense inquired about limitations on the testimony, Mr. Monck indicated a state interest in whether the witness had occasion to strike the defendant in the face on the 9th of May, 1967, and the court responded:

"Is this the purpose of eliciting that particular testimony?

Bagnell told of his acquisition of state's Exhibit 16, the .38 caliber Smith & Wesson:

"Q. Now, what did he do from that moment on, as he came out? Take it easy. A. He put his hands on top of the automobile.

"Q. Yes, when he did that what did you do? A. I came around the front of the automobile.

"Q. You came around the front of the automobile. And then what did you do with Watson? A. At that time I noticed a revolver laying in the gutter so I grabbed him and pushed him up against the tree, away from it.

"Mr. Monck: Yes.

"The Court: All right. You may proceed." (R 1457-1458)

No relevance can be assigned for the testimony on facial injuries unless it be a suggestion that statements or admissions by the defendant were forcibly secured by the police. No statements taken by the police, if any, were used. The defendant made no reference to the illegal use of force except (1) to say that he had no marks on his face on the night of his arrest (R 1897), (2) a somewhat confused reference to events in the hospital in connection with this statement to a news reporter:

"* * * I was in the hospital, and I got beat, and I seen black and white helmets, and when he asked me that morning my mind—I couldn't hardly think, and everybody kept asking me questions over and over, getting me all confused, and I couldn't acutally say what went on that night. I don't even hardly know" (R 1933),

and (3) in the following colloquy to which a state objection was sustained:

"Q. Two days later you told Mr. Black you shot at a police car, didn't you? A. That was after they had beaten me up, and I didn't know what was going on.

"Mr. Monck: Objection.

"The Court: Objection sustained."

No other witness testified in a way to indicate illegal procurement of statements. In any case, an alternate explanation for the facial marks would have been appropriate only on rebuttal, not on the case in chief, unless some circumstance, which is not apparent from the record, justified the trial court in modifying the order of the trial. See Sections 2945.03, 2945.10, Revised Code. The trial court did not attempt to limit or explain the uses of the testimony about acts involving other crimes either as it related to the gun possession or injury testimony. The general charge did not touch these subjects. Nor was a charge on them requested.

"Q. Now, where was the gun that you saw in the gutter? How far was the gun from Watson? A. At his feet.
"* * *

"Q. And who picked up the gun? A. I did.
"* * *

"Q. Officer, I will hand you what has been marked for identification state's Exhibit 16, and will you examine that, sir. Have you seen that gun before? A. I have.

"Q. Where was it the first time you saw it? A. This was laying in the gutter at the defendant's feet.

"Q. What type of gun is that? A. A .38 caliber Smith and Wesson Revolver." (R 1137-1138)

The exhibit was then offered and received in evidence (R 1138). The record shows that these events took place within minutes of the firing of the shots that gave rise to charges being placed against defendant, Watson.[5]

Officer Bagnell's testimony was corroborated by that of Officer McHugh who was with him. Defendant's possession was supported further by his admissions to a newspaper reporter who testified (R 1442) and by companions who said on the stand that they saw the gun (state's Exhibit 16) in the defendant's hands at various times before the shooting (R 1284-1287; 1312; 1384-1385).

With the evidence in this stance, anything probative stemming from possession on April 20, 1967, and May 9, 1967, was merely accumulative. Moreover, under such circumstances the probative effects of the previous possession are overbalanced by the prejudicial effects of the evidence of past acts. This is especially clear because the evidence involving the past acts was totally unnecessary to make the proof of possession the state needed.

It follows that the admission of such testimony was prejudicial unless encompassed and justified, despite the state's disclaimer, by the exceptions provided by Section 2945.59, Revised Code, the so-called "similar acts" statute. That statute authorizes proof of any of a defendant's acts which tends to show:

---

[5] A ballistics expert testified positively that the fatal bullet came from this gun, state's Exhibit 16 (R 1499-1501; 1502, 1507, 1546).

(1) his motive or intent,

(2) the absence of mistake or accident on his part, or

(3) his scheme, plan or system in doing an act.

Where those three elements, or any of them, are material, the acts may be shown whether occurring before, after, or contemporaneously with the incident giving rise to the case on trial and whether or not such proof "may show or tend to show" the commission of another crime. However, the statute does not permit a mere "piling on" of evidence, *State* v. *Strong* (Stark County, 1963), 119 Ohio App. 31, 37.

Judicial gloss has added the establishment of identity to the list of permissible objectives where identity is in issue, *Whiteman* v. *State* (1928), 119 Ohio St. 285, 290, 63 A. L. R. 595, *cf. State* v. *Ross* (Cuyahoga County, 1952), 92 Ohio App. 29, 36-37 appeal dismissed (1952), 158 Ohio St. 248, but, in proving identity by showing similarity of method, the similarity must *"itself * * * constitute proba-tive evidence of the probability that the same person (whoever he might be) committed both crimes"* without the bolstering consideration that eyewitnesses have identified the defendant as perpetrator of both crimes. *State* v. *Hector* (1969), 19 Ohio St. 2d 167, 176-178. Also, if the evidence of other acts is to be shown, case law has imposed additional conditions. The act must not be too remote in time, *State* v. *Chapman* (Franklin County, 1959), 111 Ohio App. 441, 442-443, and, while similar acts are clearly ad-missible under Section 2945.59, Revised Code, when "close-ly related" in nature and time and place to the offense charged, *State* v. *Hopkins* (Greene County, 1962), 117 Ohio App. 48, 52,[6] the connection to the offense on trial must be logical to reasonably disclose a motive or purpose, *State* v. *Moore* (1948), 149 Ohio St. 226, 229; *State* v. *Oldham* (Montgomery County Court of Appeals, 1948), 53 Ohio Law Abs. 279. However, such evidence is impermissible just to show the likelihood that the defendant "would com-

[6]Must it be an act within the "designation of *crimen falsi*"? See affirmative dictum in *State* v. *Hickman* (Erie County, 1956), 102 Ohio App. 78, 84.

mit an unjustifiable act of violence." *State* v. *Kennedy* (Butler County, 1943), 72 Ohio App. 462, 466.

Section 2945.59, Revised Code, must be strictly construed against the state, *State* v. *Strong*, 119 Ohio App. 31, and the evidence it permits must be put in perspective for the jury at the time it is offered through the trial court's instruction indicating its limited and restrictive use. *Baxter* v. *State* (1914), 91 Ohio St. 167, 171, overruled only on state's burden of proof respecting similar acts, *Scott* v. *State* (1923), 107 Ohio St. 475, 500; *State* v. *Pigott* (Cuyahoga County, 1964), 1 Ohio App. 2d 22, 30.[7] *Cf. State* v. *Haines* (Montgomery County, 1960), 112 Ohio App. 487, 490-491, appeal dismissed (1960), 171 Ohio St. 198. It has been held reversible error *not* to so instruct *even without* a request for the limiting charge, absent adequate instruction in the general charge circumscribing the use, *State* v. *Crafton* (Guernsey County, 1968), 15 Ohio App. 2d 160, 165-166, *cf. State* v. *Pigott, supra,* 30-31. This sensitivity to the proper enunciation of the place and function of "similar acts"[8] stems from the long time, well-founded concern that a defendant be tried only for the offense

---

[7] The failure to instruct on the limited purpose at the time of admission is not reversible error in the absence of a request by counsel, at least where the restricted use is adequately covered in a general charge, *State* v. *Pope* (1961), 171 Ohio St. 438, 439-440. It is error for a trial court in its charge to refer to "similar acts" evidence as "other crimes" but the error may be cured where the defendant takes the stand to admit the acts in question, *State* v. *Pigott, supra,* 31. Of course, it would be unfair to allow the state to introduce improper evidence in order to force the defendant to the option of foregoing taking the stand in his *own defense* or risking a validation of improperly admitted evidence of other crimes. See *Harrison* v. *United States* (1968), 392 U. S. 219, 20 L. Ed. 2d 1047, 1051-1053, 88 S. Ct. 2008. In this case two events were involved. The defendant admitted one (R 1888-1889) and denied one (R 1899). Since the evidence had been improperly admitted, he had small choice. The state could not demand proof from him that he would not have testified as he did had not the illegal evidence been used. *Harrison* v. *United States, id.,* 1052-1053. The burden on the point is with the state. *Harrison* v. *United States, id.* 1053.

[8] It has been held error to use the popular designation "similar offense" in charging the jury on Section 2945.59. *State* v. *Hirsch* (Cuyahoga County, 1956), 101 Ohio App. 425, 432.

charged and the obvious danger that "similar acts" evidence may prejudice the fairness of trial by exposing him to charges not laid. See *State* v. *Ross*, 92 Ohio App. 29, at 36-37.

"Fundamental has been the rule that character is never an issue in a criminal prosecution, unless the defendant chooses to make it one. The law has set its face against the endeavor to fasten guilt upon an accused person by proof of character or experience predisposing to an act of crime. The state may not prove generally against a defendant crimes not alleged in the indictment, as aiding the proof that he is guilty of the crime alleged in the indictment. * * *","[9]

Nothing of record in this case supports the existence of an objective which permits the "similar acts" evidence even were it to be assumed that the other requisites necessary to legally energize the statute were met. Accordingly, there was no legal basis to justify the interjection of evidence of other crimes into the trial. The probable effect, therefore, was to provide evidence of "collateral offenses" as "substantive evidence of the offense on trial"—a consequence condemned by the Supreme Court of Ohio in *Whiteman* v. *State*, 119 Ohio St. 285, 289-290. The first assignment of error is well taken and constitutes reversible error.

## II

It is a broadly accepted general principle that a prosecution argument outside the record, which influences the jury adversely to the defendant, denies the defendant a fair trial. See *Miller* v. *State* (1906), 73 Ohio St. 195, 205-206. Assignment No. II is bottomed on a contention that improper questions were asked for the purpose of exposing the defendant's alleged associations with black militant organizations and inflaming the jury with implications alien to the charge and unrelated to any proper purpose of the

[9]Section 2945.59, Revised Code, provides exceptions to the general rule, but "evidence of collateral offenses must never be received as substantive evidence of the offense on trial." *Whiteman* v. *State* (1928), 119 Ohio St. 285, 290.

trial. The trial court promptly and properly sustained objections to the questions. The argument, which the defense claims is outside the record and prejudicial, could be related to the excluded evidence. On the other hand, it is quite short and oblique in its reference.[10] Moreover, the ambivalence of the offending remarks, which were neither long nor specially flamboyant, is complicated by their preface—a declaration, with record support, implying that the state's statement was a reply[11] to a defense argument that the state was attempting to make the trial one "by influence and innuendo."

Conceding the unarguable—that emotional inflammation of the jury has no legitimate part in a trial—it seems to us, on this record, that there has been none of consequence, either deliberate or inadvertent, which has not been cured by the prompt intervention of the trial judge, or waived by failure to object. We find the second assignment of error without merit, and it is overruled.

### III

The third assignment of error raises the prime issue whether, in impaneling the jury in this case, sufficient care was exercised to avoid excluding for cause nondeath oriented jurors. This issue arises from a concern for the proper application of the principle laid down in *Witherspoon* v. *Illinois* (1968), 391 U. S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770.[12] That principle excises from state jury systems any jury in a capital case "organized to return a verdict of death." Specifically, it was held:

"* * * a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by ex-

---

[10]The defense did not object. For the consequences of this omission, see *State* v. *Nevius* (1947), 147 Ohio St. 263, 283, and see IV below.

[11]On the state's right to reply, see *Ross* v. *State* (Cuyahoga County, 1926), 22 Ohio App. 304, 307, 309.

[12]The principle is retroactive. See fn. 22, *Witherspoon* v. *Illinois, id.* The point was saved in the instant case by specific objection (R 117, 428-429). Contrast *State* v. *Wigglesworth* (1969), 18 Ohio St. 2d 171, 180-181, where it was found that defendant did not object and, "in effect, agreed to the excusing of the only prospective juror who was excused merely because of her opposition to capital punishment, * * *."

cluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected." 391 U. S. at 522.

In an elaboration of the principle, the court said in footnote 9 of the *Witherspoon case*:

"* * * Unless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position."

And again in footnote 9:

"The critical question, of course, is not how the phrases employed in this area have been construed by courts and commentators. What matters is how they might be understood—or misunderstood—by prospective jurors. Any 'layman * * * [might] say he has scruples if he is somewhat unhappy about death sentences. * * * [Thus] a general question as to the presence of * * * reservations [or scruples] is far from the inquiry which separates those who would never vote for the ultimate penalty from those who would reserve it for the direst cases.' * * *"

In a very recent case the Supreme Court of Ohio has clearly implied that the Ohio statute on disqualification (Section 2945.25 (C), Revised Code) has long reflected the *Witherspoon* doctrine allowing the elimination for cause only that juror whose opinions "*preclude* him from finding the accused guilty of an offense punishable with death." (Emphasis supplied.) *State* v. *Pruett* (1969), 18 Ohio St. 2d 167, 169-170. Realistically, of course, the Supreme Court of Ohio recognizes that:

"* * * even if such a statute is followed, *the record* in a case might indicate selection of a jury composed only of those *not* opposed to the death penalty. * * *" *Id.*, p. 170. (Emphasis supplied.)

Thus it appears that the general rule in Ohio closely parallels the holding in *Witherspoon*, including the explanation of the principle vouchsafed by footnote 9 in the latter case.

The *Pruett* opinion does not reveal the context of the voir dire involved in that case but concludes that unlike the situation in *Witherspoon*:

"* * * there is absolutely nothing in [*Pruett*] * * * to indicate any effort either by state legislation or by court action to exclude prospective jurors from the jury simply because of their opposition to the death penalty." *State* v. *Pruett, supra,* 170-171.

In the present case a different factual situation is presented. Here the trial court repeatedly asked this question or variations of it:[13]

"The Court: And the court had also apprised the entire panel that the defendant in this case was under indictment for murder in the first degree. You understand that?" (R 792, 793)

"The Court: Keeping that in mind, in a proper case, properly proven, that is, proven beyond a reasonable doubt, could you join with your fellow jurors and return a verdict of guilty of murder in the first degree without the recommendation of mercy, if the evidence warrants not granting such recommendation, knowing that the death penalty will have to be imposed?" (R 793)

The responses to the question and variations of it reveal equivocal answers:

"I would say no." (R 116)

"I do not believe in capital punishment." (R 459)

"It would be hard for me to do that. [*i. e.*, return a verdict of guilty without a recommendation of mercy.]" (R 514)

"No, I don't think so." (R. 584)

"No, because I don't believe in capital punishment." (R 633)

"No, I don't think I could." (R 793)

Those answers, without more, resulted in successful challenges for cause.[14]

[13]See R 115-116; 118; 426-429; 458-459; 489-491; 513-515; 578-580; 584-585; 633-634; 793.

[14]On the trial judge's duty to question, see *People* v. *Goodridge* (1969), — Cal. 2d —, 452 P. 2d 637.

With only *Witherspoon* to guide us, the propriety of the challenges and the constitutionality of the resultant jury would be in serious doubt. However, since *Witherspoon*, the court has decided *Boulden* v. *Holman* (1969), 394 U. S. 478, 22 L. Ed. 2d 433, 89 S. Ct. 1138.

The imperfections found in the testing of the jury in *Boulden* provide the sure litmus for the test in the instant case.

In *Boulden* eleven veniremen were excused for cause on the basis of their affirmative responses to the question:

"Do you have a fixed opinion against capital punishment?"

Two others were excluded because they did not "believe in" capital punishment. Of these exclusions the court said:

"* * * Yet it is entirely possible that a person who has 'a fixed opinion against' or who does not 'believe in' capital punishment might nevertheless be perfectly able as a juror to abide by existing law—to follow conscientiously the instructions of a trial judge and to consider fairly the imposition of the death sentence in a particular case." *Boulden* v. *Holman*, 394 U. S. at 483, 484.

The court concluded that the death sentence imposed on the petitioner could not constitutionally survive *Witherspoon*.[15]

Juxtaposing what is condemned to *Boulden* to what was done in the present case, we find no distinction warranting a difference. We conclude that an unconstitutional jury was impaneled. Accordingly, we find that the sen-

---

[15]However, for a variety of reasons the *Boulden* court did not finally decide the question. "First, the *Witherspoon* issue was not raised in the District Court, in the Court of Appeals, nor in the petition for certiorari filed in this Court. A further hearing directed to the issue might conceivably modify in some fashion the conclusion so strongly suggested by the record now before us. Further, it is not clear whether the petitioner has exhausted his state remedies with respect to this issue. Finally, in the event it turns out, as now appears, that relief from this death sentence must be ordered, a local federal court will be far better equipped than are we to frame an appropriate decree with due regard to available Alabama procedures." 394 U. S. at 484, *id.* at 439.

tence of death[16] in this case cannot be constitutionally justified on the record as it stands, and on this ground the third assignment is well taken and constitutes reversible error.

## IV

Assignment of error No. IV proceeds on the theory that the assistant prosecutors exceeded permissible bounds in arguing for the death penalty. The contention seems to be that the prosecution exceeded the limits of propriety in calling the defendant a "cunning animal,"[17] and in placing the prosecutor's experience before the jury in a way to suggest that this case, of the approximately 800 murder cases one of the asistant prosecutors had tried, was one of the few particularly deserving merciless treatment. Finally, it is claimed that the argument was faulty in calling the defendant a "hoodlum," and in justifying a call for the death penalty to support the police officers[18] and to inform the community that the jury was going to preserve our "way of life."

The question of mercy is for the jury on all the evidence in the case, *Howell* v. *State* (1921), 102 Ohio St. 411, 413, 422-423; *Rehfeld* v. *State* (1921), 102 Ohio St. 431, 435. The prosecution may argue against mercy just as the defense may argue for it—both within the record, *Howell* v. *State, id.* at 423-424. Of course, it is reversible error for the prosecutor to give the jury his personal opinion of the defendant's guilt. *State* v. *Thayer* (1931), 124 Ohio St. 1, 5-6; *State* v. *Young* (Franklin County, 1966), 7 Ohio App. 2d 194, 197; *State* v. *Cloud* (Cuyahoga County, 1960), 112 Ohio App. 208, 215-216. We take the same view where the opinion is offered on the question of mercy, but to warrant

---

[16]If a jury recommends mercy, the effect is to moot the application of the *Witherspoon* principle. *Bumper* v. *North Carolina* (1968), 391 U. S. 543, 20 L. Ed. 2d 797, 88 S. Ct. 1788.

[17]In fact, the record supports a considerably less abrasive implication. In exact terms it reads: "He is thinking of himself, he is cunning. He is cunning like an animal is cunning." (R 2072)

[18]The record shows immediate objection to the hoodlum characterization and the call for support for the police (R 2177), but no objection to argument related to animal cunning or the prosecutor's judgment on the issue of mercy until a defense motion for mistrial after the state concluded its argument. (R 2184-2185)

reversal there must be an objection to the offending remarks and "at once" "unless so flagrantly improper as to prevent a fair trial." *State* v. *Nevius* (1947), 147 Ohio St. 263, 283.[19] *Cf. Landesman* v. *Western Reserve University* (1936), 132 Ohio St. 131, 134.

Where an objection is required, it has been held necessary both to object *and* request that the jury be instructed to disregard the objectionable statements to avoid waiver of the error. *State* v. *Landrum* (Cuyahoga County, 1953), 96 Ohio App. 333, 341-342, appeal dismissed (1953), 160 Ohio St. 358. But *cf. Gawn* v. *State* (Lorain County, 1896), 13 C. C. 116, 124-126, 7 C. D. 19, and *Lonardo* v. *State* (Cuyahoga County, 1931), 34 Ohio Law Rep. 434, 437-438.

The lack of objection to the assistant prosecutor's giving his personal opinion on the mercy issue, as we read *Nevius*, forecloses reliance on that action as a basis for appeal on the record in this case.

The prosecution's "hoodlum" characterization went at least to the edge of justification in the absence of any record support unless such support be gleaned from that evidence on the gun possession and facial injuries, which was improperly admitted.[20]

---

[19]It is not clear from *Nevius* that putting the prosecutor's opinion of the defendant's guilt before the jury is one of the "flagrant" improprieties providing a predicate for error without objection, although there is a strong implication that it is not from the court's discussion of *State* v. *Thayer, supra,* and *Scott* v. *State* (1923), 107 Ohio St. 475. The issue was not squarely faced in *Nevius* because from the (inadequate) record "* * * it does not affirmatively appear * * * that the accused was prejudiced thereby or was prevented from having a fair trial." *State* v. *Nevius, id.* 280-281. *Cf.* Section 2945.83 (E), Revised Code. This was the *Nevius* court's conclusion after determining that not enough of the argument was exemplified in the record to determine whether the prosecutor's action was a response provoked by a defense argument. *Id.* 280. Some improprieties may be so gross that no instruction would yield a correction. *P. e.* see *Bruton* v. *United States* (1968), 391 U. S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, on the inefficacy of instructions in curing the effects of the admission of a confession of a codefendant who did not testify in a joint trial.

[20]The consideration governing the use of evidence of a previous injury during a claimed robbery attempt on the state's case in chief

The impropriety of importuning the jury to support the police and to "pronounce to this community that you are going to preserve our society, our way of life," to secure a no-mercy verdict raises serious questions. A somewhat analogous argument appealing to the "public" concern with narcotics (among other examples of misconduct) was held "prejudicial to the substantial rights of the defendant" in *State* v. *Cloud*, 112 Ohio App. 208, at 211, 214. A jury trial presumes that the jury will apply the law, pronounced by the trial judge, to the facts found by the jury. For that reason a verdict is designed not to be a vicarious plebiscite of the public's emotion but to make secure the public interest in a fair trial. The way to support the police and preserve for the public that part of our way of life which concerns the criminal process is to adhere steadfastly to the rule that the law and the facts of a particular case decide it. Other considerations are extraneous and improper.

The Court of Appeals of the Fifth Appellate District has succinctly stated the controlling general principle:

"* * * A man on trial for his life is entitled to insist that the state observe all the rules and limitations which it itself has imposed, which are conducive to a fair and impartial trial." *State* v. *Strong* (Stark County, 1963), 119 Ohio App. 31, 35.

The stance of the facts in this case does not lead us to conclude that the error exemplified by the fourth assignment of error, *standing alone*, would warrant reversal. However, since the case is to be reversed on other grounds, and may be retried, we note, with emphasis, the impropriety of the actions this assignment attacks. See, also, *Hoare* v. *Cleveland* (1933), 126 Ohio St. 625, 628, on objectionable evidence in close controversies.

## V

The fifth assignment of error argues that the admission of the defendant's in-custody statement to a press re-

has been discussed in footnote 4 above. See *State* v. *Kennedy*, 72 Ohio App. 462, 468, on the impropriety of argument based on erroneously admitted evidence.

porter was erroneous because the trial court overruled a defense motion to suppress without establishing that the statement was not "influenced or tainted" by earlier in-custody statements to law enforcement officers.

On the record in this case it is clear that the statement of which the defense complains was elicited by a newsman. There is no evidence that he was vicar of the state. In this situation *Miranda* v. *Arizona* (1966), 384 U. S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A. L. R. 3d 974, has no application unless a connecting contamination from a state source can be established. See *Fahy* v. *Connecticut* (1963), 375 U. S. 85, 11 L. Ed. 2d 171, 84 S. Ct. 229; *cf. Harrison* v. *United States* (1968), 392 U. S. 219, 20 L. Ed. 2d 1047, 88 S. Ct. 2008. This record will support no such contamination. Neither is it accurate, on this record, to say that the trial court blocked the inquiry which might have established it.

We find the fifth assignment of error without merit, and it is overruled.

For the reasons, and in the particulars noted in this opinion, the judgment below is contrary to law. It is, therefore, reversed and the cause is remanded for further proceedings according to law.

*Judgment reversed.*

SILBERT, C. J., and WHITE, J., concur.