THE STATE OF OHIO, APPELLEE, *v.* STRONG, APPELLANT.*

(No. 3019—Decided June 24, 1963.)

*Mr. Norman J. Putman,* prosecuting attorney, for appellee.
*Mr. Nicholas C. Caplea* and *Mr. Harry W. Schmuck,* for appellant.

*Motion for leave to appeal overruled (38397), December 11, 1963.

McLAUGHLIN, J. This is an appeal from a conviction and death sentence in a first degree murder case.

The defendant shot and killed his wife, Iris Strong, on March 2, 1962, at a Canton barroom known as the Gay Nineties, which they owned jointly.

They lived in Alliance, had no children of their own, but a four-year-old foster child lived with them. One, Audrey Ross, who worked for them as a barmaid also lived there.

Late on the night before the killing, the defendant took Audrey Ross to their home. Mrs. Strong, the deceased, in a jealous rage, threatened defendant with a shotgun. They had for some time been quarreling, bickering and threatening each other. She had threatened suicide, and had been making trouble calls to the Canton and Alliance police.

At about 6 a. m. on the morning of the shooting, the defendant and Audrey Ross came back to Canton to the barroom. Sometime later the wife followed and there were various events happening during the day in continuation of their quarreling. The wife, who had been drinking, hired a private detective. She took the money bag from the bar's cash register and it was cut open in the detective's office. She stored the defendant's car in a garage. She then returned to the bar where the quarrels continued.

Immediately prior to the shooting, the private detective came to the barroom and the wife followed him into the men's room. She came out after awhile and said to the defendant, "I have enough on you to send you to jail for life." In the meantime, the defendant had procured a gun and sat down at a back table, concealing the gun under his leg. He later stated, "I waited for her to say something that would inflame me to commit such an act." He waited for about half an hour. The wife whispered to a customer sitting at the bar, who laughed. The defendant went behind the bar and shot and killed Iris Strong. He fired four bullets, three of which entered her body. The private detective then fired three shots, two of which entered the defendant's abdomen. Then the defendant shot at the detective but missed.

The defendant gave the investigating authorities three statements which were reduced to writing and received over objection at the trial.

The first was a rather full confession of the murder of his wife, Iris Strong.

The second was a like confession that in August 1961 he, with the aid of Iris Strong, his wife, robbed and killed one, James Crawford, an antique dealer, at his home in Reedurban between Canton and Massillon. Iris Strong drove the defendant to the Crawford home and picked him up after the Crawford murder.

The third was a statement that he and another man, on or about June 20, 1961, with the aid of Iris Strong, had disguised themselves and, by pretense of being police officers, obtained entry into the home of one, Ben Adelman, and at gun point robbed and looted that home. Iris Strong's participation in that crime consisted in helping the two men disguise themselves.

The defendant was tried, found guilty without a recommendation of mercy, and sentenced accordingly. He has perfected his appeal to this court.

The first assignment of error is that the court erred in failing to discharge the entire panel of jurors for prejudicial remarks and comments by a juror during the *voir dire* examination. One, Sarah Davis, was called as a prospective juror, her number being 29. She was examined by the prosecutor who asked the following questions:

Direct examination by Mr. Putman.

"Q. Mrs. Davis, the record in the jury commission office indicates that when they inquired of you concerning your service here, that you told them in substance that you were opposed to capital punishment. Is their record correct? A. I usually don't believe in capital punishment but in this case I do.

"Q. I see. Would it—I understand you to mean in cases of where the facts are some way it makes a difference as distinguished from other sorts of cases, is that what you mean? A. Yes. This man, he killed two people and—

"Q. Now before— A. (Continuing) and a dog.

"Q. Now before I mislead you somehow to giving some answers that might affect the other prospective jurors, let me ask you—without going into detail—would—is it fair to say you have an opinion about this particular case—and I am not asking you what it is. A. Yes, I definitely do.

"Q. See, we have certain legal rules and I want to be very careful— A. (Interrupting) I certainly do.

"Q. (Continuing) and don't want to cause someone to cross over them. I gather from the feelings you expressed, you probably couldn't put those feelings aside and begin this case impartially? A. That's right, I couldn't and be fair about it.

"The Court: All right, Mrs. Davis, the court appreciates your being frank and honest about it, so you will be excused.

"(At this point Mrs. Davis steps down from witness stand.)

"Mr. Schmuck: (Quietly) Now comes the defendant and moves the court to dismiss the entire jury by reason of the highly prejudicial and inflammatory statements made by the previous juror—member of the venire—in the presence of the entire other jurors.

"At this point the above motion made by Mr. Schmuck was read to the court (quietly) by the reporter.

"The Court: Ladies and gentlemen of the jury—of the jury panel, during—you are in a position to hear the answers of some of these prospective jurors, and, of course, you are to give no significance whatever to any opinions expressed by any juror who is being qualified to sit on this jury, so whatever you may hear from any juror you are not to give that any consideration. In the event that you are selected to sit on this jury, that isn't your reason—your function at all."

Two questions immediately arise from the particular words of this prospective juror, "This man killed two people and a dog," as to whether these remarks in the presence of other prospective jurors were so highly prejudicial and inflammatory as to constitute reversible error per se. It must be remembered that this was at the very beginning of this trial in which the supreme death penalty was demanded by the state. When this prospective juror said, "I usually don't believe in capital punishment but in this case I do," the prosecutor should have stopped any further interrogation and it was the duty of the court to make him do so. The court, on its own motion, should have protected the defendant from this kind of courtroom atmosphere, and the failure so to protect him, especially after his counsel moved and demanded such protection, was erroneous and prejudicial. Eight other prospective jurors were seated in the box and heard this statement. Six of them actually served

on the jury which meted out the death penalty. It should be noted also that it was impossible for defense counsel to object and stop this interrogation or engage in questioning them without emphasing before the panel the very words which the prospective juror had said. It is noted also that the defense did not have enough peremptory challenges to remove all those prospective jurors who had heard the damaging words. We are cognizant of the fact that the defendant used only five of his six peremptory challenges. Yet it is apparent that his use of the one remaining would have still left on the jury five jurors who had heard the damaging remarks of Mrs. Davis.

The second question arising with respect to this claimed error is whether the admonition of the court was sufficient to cure the alleged error of these remarks.

It must be remembered that the defendant in this particular case was on trial for his life and these remarks, coming at the very beginning of the trial while the stage was being set, were particularly damaging to the constitutional rights of the defendant to be tried for the murder of Iris Strong only, and for the defendant to have the guaranteed presumption of innocence carried through the whole course of this trial until all the evidence has been presented. Who is to say to what extent these remarks by this prospective juror may or may not have contributed to the jury's verdict which carried with it the death penalty. Such remarks as this prospective juror made at that particular time might have been the difference between life and death to this defendant. The conduct of the prosecutor in continuing his examination after the juror had definitely expressed an opinion, and the neglect of the court to stop the proceedings at that point, in our opinion, constituted such prejudicial error and created such an atmosphere that must have affected the whole course of the trial, including the jury's deliberations, to such an extent that it cannot be said that the defendant in this particular case was afforded that fair trial guaranteed by the federal and state Constitutions. A man on trial for his life is entitled to insist that the state observe all the rules and limitations which it itself has imposed, which are conducive to a fair and impartial trial.

It is urged that because the evidence of guilt in this case is so overwhelming that this alleged error should be ignored. Such

argument has merit in the ordinary criminal case. To our minds it does not apply in a capital case.

It is urged also that the error is cured by the court's admonition to the jury, and, without citation of authority, the prosecution has said that the same rule applies to any improper argument or misconduct by the prosecutor where such an admonition as was given here is made. Such contention has merit in the ordinary criminal case, but in a capital case where a man is on trial for his life, in our opinion, such an error was committed here as could not be cured by the admonition of the court then given. The trial court should have sustained the defense motion and discharged the array of prospective jurors. The first assignment of error is, therefore, sustained.

The second assignment of error claims that the trial court misinterpreted Section 2945.59, Revised Code, which provides as follows:

"In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant."

This statute, being in derogation of the common-law rule of exclusion which did not permit other acts to be shown at all, must be construed strictly against the state. By virtue of this section, the trial court properly admitted the statements of the defendant as to the Crawford murder and the Adelman robbery to show intent and motive in the murder of Iris Strong.

It was the theory of the state that the deceased wife, Iris Strong, knew of and had participated in other crimes committed by the defendant and that such knowledge was the basis of her making the statement, "I have enough on you to send you to jail for life," and that the defendant, knowing that she knew about the Crawford murder and the Adelman robbery, had committed this murder of his wife in order to seal her lips. The statements of the defendant with respect to the Crawford mur-

der and the Adelman robbery which detailed Iris Strong's participation therein were properly admitted in evidence under the statute since they tended to show and establish motive and intent in the killing of Iris Strong, and thus did support the state's theory.

But in this case the trial court permitted the prosecution to go much further and to bring out by testimony and many exhibits, all the gory details surrounding the commission of the Crawford and Adelman crimes. While such evidence was cumulative or as stated a "piling on," the state was permitted to go to unusual and unwarranted lengths in showing such details of these two other crimes, that the defense was put in the position of having to defend not only the charge of killing his wife but also of defending himself of the charge of killing Crawford and robbing the Adelmans. A strict interpretation of Section 2945.59, Revised Code, *supra*, does not permit such cumulative or "piled on" evidence.

We consider that it was an abuse of discretion for the trial court to permit the state to thus detail the facts of the other two crimes here mentioned. It did, in fact, magnify the error committed by the prospective juror as set forth in the first assignment of error, *supra*.

We note in the record at least three instances where the trial court misinterpreted Section 2945.59, Revised Code, *supra*, and admitted evidence of other offenses which had not even a remote connection with the type authorized by the statute and that even a very liberal construction would not permit. A state's witness testified as follows:

"Q. Now referring yourself to what Mr. Strong told you on the morning of the 27th of March, is there anything else you can tell the jury, having refreshed your recollection from your notes at this time? A. I believe the only other thing he made mention of was the fire at—in the residence that occurred some time back—several years ago.

"Q. Tell the jury what Mr. Strong said that morning?

"Mr. Schmuck: Object to that.

"The Court: Is this including another matter—a fire?

"(At this point Mr. Putman and Mr. Schmuck conferring at bench.)

"The Court: All right, the objection is overruled.

"By Mr. Putman: (Continuing)

"Q. Directing your attention to 'K-4,' please tell the jury what Kenneth Strong told you about that? A. He told me he had set fire to his home in 1957 while he was living at Alliance, or attempted or did burn his home in order to show the Alliance Police Department that he was smarter than they were and that he could get away with this arson.

"Mr. Schmuck: Motion to strike.

"The Court: Overruled."

Another state's witness testified as follows:

"Q. Well, did—what was your relationship with Kenneth Strong at that time? A. Just a friend.

"Mr. Schmuck: Object.

"The Court: Overruled. What was the answer?

"Reporter: (Reading [quietly] to court: 'A. Just a friend.')

"The Court: It may remain.

"By Mr. Putman: (Continuing)

"Q. Well, was there any animosity between you at that time? A. No, sir.

"Mr. Schmuck: Object, he already answered.

"The Court: Well, he says, 'No,'—it may remain. Overruled.

"By Mr. Putman: (Continuing)—

"Q. Now what was your relationship with Kenneth Strong previous to about January 9th of 1962?

"Mr. Schmuck: Object.

"The Court: You may answer. Overruled.

"Witness: My relationship with Kenneth as of January 9th?

"By Mr. Putman: (Continuing)

"Q. At the time preceding—for the three months preceding January 9th? A. Well, we had—

"Mr. Schmuck: Object.

"Mr. Caplea: Object.

"The Court: Overruled.

"Witness: We had an abnormal relationship.

"By Mr. Putman: (Continuing)

"Q. And that—

"Mr. Schmuck: Object and ask it be stricken. Motion to strike, your Honor.

"The Court: It may remain. Overruled.

"By Mr. Putman: (Continuing)

"Q. For how long a period of time— A. Ah—

"Q. (Continuing) if you can recall? A. Approximately two months."

Another state's witness testified in part as follows:

"He told me that he was a 'heavy' and I said, 'I didn't know what that meant.' He said, 'That he was familiar with the use of nitroglycerine and high explosives.'

"He also said that he was familiar with the use of a .45 automatic with dumb-dumb bullets, and that with the use of this sort of a gun he could virtually blow someone apart; ah—he also stated that he had on various occasions set fire to buildings and he had—

"And he had—ah—connections with the Canton Police Department; he had arrangements made with a Bones Battista, who was arrested not too long afterwards for operating a gambling house, and that Bones Battista made arrangements with the local police department and the Mafia and others to see to it that the Canton Police Department was out of the way when certain burglaries and bombings were to take place; ah— he told me that he had connections with the Mafia and that if anybody ever crossed him that they would get blown apart."

We note that in each of these three instances, the trial court permitted the testimony to go in over objection; to remain after motions to strike; and that no admonition was given to the jury as to any limited purpose for their admission.

The common-law rules of exclusion of other offenses was modified to some extent by the case of *Whiteman* v. *State*, 119 Ohio St., 285, wherein the question of identity was an issue. It was further modified by Section 2945.59, Revised Code, *supra*, whenever the question of motive, intent, plan, scheme, lack of accident, etc. was a material issue.

While great latitude is given to the trial court as to cumulative evidence concerning other offenses, which are properly admitted into evidence, a strict construction of 2945.59, Revised Code, *supra*, does not permit the showing of such offenses as have no connection with the crime for which the defendant is on trial, and such "piling on" and the admission of the evidence to unrelated offenses, such as arson, sex deviation and bombings, taken in connection with remarks of the prospective

juror to which we have alluded, contributed to such an extent that they magnified the error specified in the first assignment of error, and thus taken together prevented this defendant from having a fair trial.

In the instant case only the defendant's motive or intent in doing the murder of his wife was material. How can an act of arson or sex deviation or bombings even tend to show motive or intent to commit murder? To be admissible, testimony offered under this section (2945.59, Revised Code) must show acts so related to the offense for which the defendant is on trial that they have a logical connection therewith and may reasonably disclose a motive or purpose for the commission of such offense. See State v. Oldham, 53 Ohio Law Abs., 279.

The case of State v. Moore, 149 Ohio St., 226, is of particular significance in the interpretation and construction of Section 2945.59, Revised Code (formerly Section 13444-19, General Code). The syllabus reads:

"1. The like acts or other acts which may be shown against a defendant in a criminal case, within the contemplation of Section 13444-19, General Code, are acts of a character so related to the offense for which the defendant is on trial that they have a logical connection therewith and may reasonably disclose a motive or purpose for the commission of such offense.

"2. In a prosecution for felonious homicide, testimony as to threats made by the defendant against a third person sometime prior to the killing, with which former incident the deceased had no connection and which formed no part of the affair in which the deceased was killed, is not, over objection, admissible in evidence against the defendant."

Judge Zimmerman, on page 229, said:

"Such section, permitting the introduction of evidence of 'like acts or other acts' committed by a defendant, to show an intent or motive for committing the offense with which he is charged, is declaratory of the common law, perhaps in a broader form. To be admissible, testimony offered under the statute must show acts so related to the offense for which a defendant is on trial that they have a logical connection therewith and may reasonably disclose a motive or purpose for the commission of such offense."

And at page 230:

"Granting that a trial court should be accorded latitude in admitting testimony under the provisions of Section 13444-19, General Code, a majority of the court in the present case entertains the opinion that the conduct of the defendant toward Morgan, as testified to by the latter, showed only that the defendant was an intemperate individual given to the utterance of threats of dire portent when aroused to anger (*Maddox* v. *State*, 134 Tex. Cr. App., 289, 115 S. W. [2d], 644), and that such testimoney did not tend to prove intent or motive in connection with the killing of Hall.

"Morgan's testimony as to collateral matters not relevant to the crime with which the defendant was charged might well have been a factor in turning the jury against the defendant and in causing it to reject his version of the manner in which Hall met his death."

These words are very apropos to the instant case, this being a first degree murder case. Judge Montgomery of this court said in the case of *State* v. *Cocco*, 73 Ohio App., 182: "Who can say to what extent the conviction may have been due to incompetent evidence?"

In the instant case we cannot conceive of any theory that would permit testimony of an act of arson or an act of sex deviation to be presented to this jury, there being no evidence to connect the deceased, Iris Strong, with either offense. It could not do otherwise than prejudice and inflame the jury against the defendant, and testimony as to these collateral matters, not relevant to the crime with which the defendant was charged, might well have been a factor influencing the extent of the verdict. Again we say that the admission of such evidence might have made the difference between life and death to this defendant. To hold otherwise would open the door and permit the showing of any and all collateral or other offenses.

In a first degree murder case where the defendant's very life is at stake, the law spreads its special mantle of protection over the accused, regardless of who or what he is or what he may have done previously. This mantle of protective law gives him the right to push on all the stops and to insist that the state touch all the bases.

It is urged that there is overwhelming evidence of guilt in this case and that these errors, which we have pointed out,

should be ignored. Such contention does not apply in a capital case where the defendant is on trial for his life. In a capital case the jury has the extremely important duty to decide whether or not it shall recommend mercy. In this case it is to be observed that Iris Strong was killed in the heat of a husband and wife quarrel of many hours duration and that the quarreling was not without many contributing faults of the deceased wife. Who can say to what extent the death verdict may have been due to the incompetent evidence or other errors which we have attentioned? The second assignment of error is, therefore, sustained.

Assignment of error No. 3 goes to the admission of evidence objected to. The matters contained in this assignment of error are substantially the same as those referred to in assignment of error No. 2, and this assignment of error will be sustained for the same reason.

As to assignment of error No. 4, we find no error in the court refusing to order statements of the defendant to be given to defense counsel for examination and inspection before trial. This assignment of error is, therefore, overruled.

Assignment of error No. 5 goes to the charge of misconduct of the prosecuting attorney during trial. From an examination of the whole record we cannot say that there was any misconduct as constituted in and of itself prejudicial or reversible error in this case. This assignment of error is overruled.

Assignment of error No. 6 is overruled. It goes to the weight of the evidence. The record indicates abundant and adequate evidence of guilt. What the case lacked was a strict compliance with the rules of law and evidence as we have pointed out.

As to assignment of error No. 7, we find no other errors apparent in the record which are prejudicial.

This court has previously commented upon the seriousness of a capital case trial and the protection which the Constitutions of the United States and of the state of Ohio both afford to one charged with first degree murder. We quote from the case of *Brooks* v. *State*, 17 Ohio App., 510, at page 519. Shields, J., states:

"Of course courts have fixed rules of procedure in all trials, which cannot be disregarded at will, and it is not too much to

say that both the law and courts aim to afford one charged with crime his legal and constitutional right, namely, a fair trial. Such is the policy of the law, and in its administration we believe that courts have uniformly sought to so execute it, but in the wide domain of thought and judicial investigation our minds do not always travel in the same direction, nor do we always reach the same legal conclusion under the same state of facts. But in the administration of the criminal law, especially where the life of a human being is at stake, the moral responsibility is increased by the jealous care with which the law regards life, and the trial of one thus charged calls for the strictest observance of the statutory provisions made for the protection of such life.''

And in the case of *State* v. *Cocco*, 73 Ohio App., 182, at page 187, Montgomery, P. J., makes another statement which we consider to be particularly apropos to the instant case.

''It seems to us that there can be no doubt of the error committed in the respects mentioned, and that this man did not have a fair trial, a trial to which he was entitled under the rules of law prescribed and which should have been understood.

''The state contends that these matters, even if erroneous, should be ignored. The proposition is advanced that this defendant is guilty of the crime charged and that such guilt is proved by unquestioned evidence. The record would so indicate although it is to be observed that the proof of the killing of the deceased was by circumstantial evidence.

''But it is not sufficient to say that there is adequate proof of guilt. It does not follow that the defendant was not prejudiced erroneously by the injection into the case of the matters we have discussed. Who can say to what extent the conviction may have been due to incompetent evidence and improper argument? There is no 'substantial justice' statute such as applies to civil actions.

''Ours is not an arbitrary or autocratic government. It is a matter of contract between the state and the individual. The latter is bound to defend, support and maintain the government. The state is bound to guarantee to the individual, life, liberty, and the right to pursue happiness, and the greatest of these is life.

''The state prescribes the conditions under which the in-

44

dividual may be deprived of any of these rights. The individual by retaining his citizenship or his residence accepts these limitations upon the governmental guaranties. But in doing so, he reserves the right to insist that the state, in working such deprivation, shall proceed according to the rules prescribed by its agents, the Legislature and the courts. He is entitled by natural right and by compact to safeguard himself against any violation by the state of the rules it has adopted.

"To put it succinctly, a man on trial for his life, his most valuable possession, the most sacred of his guaranteed rights, is entitled to have strict compliance with the rules of law, regardless of the probability or even the proof of his guilt."

In the instant case, it is our opinion that the defendant did not have a fair trial. He is within his constitutional rights in demanding strict compliance with the rules of law which was not afforded him in spite of his apparent guilt because of the errors which we have pointed out.

The judgment is reversed, and the cause remanded for further proceedings according to law.

*Judgment reversed.*

Van Nostran and Rutherford, JJ., concur.