603 P.2d 538

**STATE of Arizona, Appellee,**

v.

**Ken DUFFY, Appellant.**

**No. 1 CA–CR 3423.**

Court of Appeals of Arizona, Division 1, Department A.

Sept. 18, 1979.

Rehearing Denied Nov. 16, 1979.

Review Denied Dec. 4, 1979.

268

Robert K. Corbin, Atty. Gen., by William J. Schafer, III, Chief Counsel, Crim. Div., Philip J. MacDonnell, Director, Sp. Prosecutions Div., and Mark E. Aspey and Barnett S. Lotstein, Asst. Atty. Gen., Phoenix, for appellee.

David M. Lurie, Phoenix, for appellant.

## OPINION

CONTRERAS, Judge.

Appellant, in two counts of a 95-count indictment issued by the grand jury, was charged with the crimes of grand theft through false pretenses, pursuant to former A.R.S. §§ 13–661(A)(3) and 13–663(A)(1) along with conspiracy in the second degree pursuant to former A.R.S. § 13–331(B). A jury found appellant guilty on both counts and he was sentenced to not less than eight nor more than ten years' imprisonment on Count I (grand theft through false pretenses) and not less than three nor more than four years' imprisonment on Count II (conspiracy), to run concurrently. We affirm the conviction and sentence.

By way of background, the State Grand Jury, on August 31, 1976, returned a 95-count indictment against fifteen former officers, employees and associates of Combined Equity Assurance Company. The subsequent prosecution was based on the thesis that principals of Combined Equity (an insurance company and later a real estate development company) and Prescott Valley, Inc. (another real estate development company) had over a period of seven

years conspired to defraud (1) investors throughout the United States and various foreign countries who purchased real estate lots in the Concho Lakelands Subdivision located near Show Low, Arizona, and (2) investors who purchased securities consisting of lot purchasers' promissory notes and mortgages along with "loan packages" collateralized by lot purchasers' promissory notes and mortgages.

After the return of the indictment, all fifteen defendants were arrested, arraigned and released on their own recognizance or on bond. Over the following 17 months, 13 of the 15 defendants entered pleas of guilty to various charges and received sentences ranging from probation to imprisonment. The speedy trial provision of Rule 8 of the Arizona Rules of Criminal Procedure was suspended with the net result that appellant and a codefendant, Clyde Dinnell, were scheduled for trial on January 16, 1978. Trial commenced and after the testimony of four of the state's expected witnesses, appellant's codefendant pled guilty to 11 felony charges. (Dinnell was subsequently sentenced to 9 to 10 years in the Arizona State Prison). As a result of Dinnell's plea after the commencement of trial, appellant's motion for a mistrial was granted and trial with appellant as the sole defendant commenced on March 6, 1978. The trial extended over a period of four weeks and the jury returned a verdict of guilty on both counts. After denial of appellant's motion for a new trial and following sentencing, appellant filed a timely notice of appeal.

Appellant's appellate counsel (who did not represent appellant at trial) has presented a number of issues on appeal. For the sake of clarity, these issues, after a statement of the facts supported by the evidence, will be discussed under appropriate and separately designated headings.

THE FACTUAL BACKGROUND

The evidence presented at trial showed that in 1967, Marvin Schallman (a codefendant under the indictment) formed an insurance company called Pyramid Planners Assurance Company, the name of which was changed in 1972 to Combined Equity Assurance Company (and will hereafter be referred to as Combined Equity). This company was subject to regulatory control by the Arizona Department of Insurance including periodic audits to determine financial stability. Combined Equity experienced continued financial difficulties and in an effort to avoid bankruptcy, Combined Equity decided to remain an insurance company but to also enter the land development business by subdividing undeveloped land and selling it to purchasers throughout the United States and several foreign countries. Pursuant to this decision, Combined Equity acquired a subdivision known as Concho Lakelands from Prescott Valley, Inc., a land development company. Concho Lakelands is located in northern Arizona between the cities of St. Johns and Show Low. Concho Lakelands was described at trial as being "barren", "treeless", covered with "volcanic ash" and resembling the surface depicted in photographs of astronauts "walking upon the moon".

After acquiring the property and in order to establish and develop its land sales program, Combined Equity hired Clyde Dinnell, the former land sales director for Prescott Valley. Dinnell in turn hired appellant who had been one of his associates at Prescott Valley and placed him in charge of out-of-state land sales with the title of vice-president. Appellant's office and personal secretary were located in the company's headquarters in Phoenix and it was from this office that appellant supervised, implemented and controlled the activities of Combined Equity's salesmen throughout the United States.

The evidence establishes that two basic methods were utilized by Combined Equity to generate income. The first involved the direct sale of land itself contained in Concho Lakelands. In this regard, the testimony and exhibits admitted in evidence disclose that numerous purchasers were induced to purchase Concho Lakeland subdivision lots based upon numerous misrepresentations by sales personnel employed by Combined Equity. These misrepresentations were made both orally and through

written sales brochures provided by Combined Equity. The second method engaged in by Combined Equity to generate income, stated in a simplistic fashion, involved the fraudulent sale of "securities". At the time that a subdivision lot was sold, the purchaser would execute a promissory note, a land purchase contract and a realty mortgage. This "package" of documents which was generated as a result of a sale of land would then be sold or assigned to investors in Combined Equity.

Although these two methods resulted in the generation of considerable income, the overall financial status of Combined Equity continued to decline until, ultimately in September of 1974, Combined Equity was placed in receivership by the Arizona Department of Insurance with an impairment in excess of $3.5 million. The evidence established that Combined Equity had expended a substantial portion of income for its corporate officers and personnel on such items as expensive cars, gifts, luxurious homes, race horses, generous expense accounts, and inflated salaries. The collapse of Combined Equity caused its policyholders, investors and lot purchasers to lose millions of dollars.

The count relating to the crime of grand theft through false pretenses charged appellant with defrauding Mr. and Mrs. Robert Miller of Elkhart, Indiana. The Millers first met appellant at a dinner party sales presentation held by Combined Equity in Elkhart. At this presentation, promotional literature was distributed and slides were shown which purportedly depicted property at Concho Lakelands in the "White Mountain" area of Arizona. The following evening at the Millers' home, appellant persuaded the Millers to purchase three lots at Concho Lakelands. The Millers issued a check in the sum of $4,543.08, payable to Combined Equity, which represented the down payment and one year's advance payment on all three lots. The Millers' check, along with the completed paperwork, was mailed to Phoenix for processing and acceptance. The contract was accepted by Combined Equity in Phoenix, Arizona, and the check deposited to Combined Equity's checking account.

The evidence further discloses that in securing the sale of these three lots to the Millers, appellant represented that Combined Equity was an extremely large Arizona insurance company with $75 million in reserves. He further represented that, because of such extensive reserves, the subdivision being developed was assured to be of high quality. Appellant told the Millers that their promissory notes and realty mortgages would not be sold. Appellant also stated that each of the three lots purchased could be subdivided at no additional cost into three lots making a total of nine lots and that Combined Equity would sell the lots for them at no extra charge. Appellant also assured the Millers that they would be able to cancel the contracts and receive a full refund if, within one year of the purchase date, they personally inspected their property and did not find it to their satisfaction.

In May of 1974, five months after the sale, the Millers came to Arizona to inspect their property and evaluate their investment. Although the Millers were flown over their property by a representative of Combined Equity, they were discouraged from inspecting the property at ground level. Although they were disappointed in the land as seen from the air, they signed an "Inspection Notice" indicating they were satisfied with the property. They reluctantly signed the Notice because of the vast "investment potential" which appellant had portrayed to them.

After returning to Indiana and in August of 1974, the Millers sat in on an additional dinner meeting presented by a different Combined Equity sales crew. A slide presentation similar to that seen by them during the first dinner presentation was shown to prospective buyers. The Millers were immediately able to determine that some of the slides were not of Concho Lakelands.

Combined Equity was placed in receivership in September of 1974 and in December of 1974, the Millers learned of the receivership. They also learned that the notes and

mortgages they had signed had been sold or assigned. In addition, and without the Millers' knowledge, one of the lots they had purchased was sold to a couple from Nebraska. In real estate parlance, this is referred to as "double decking".

JURISDICTION TO MAINTAIN THE PROSECUTION

■ Appellant first contends that Arizona has no jurisdiction to prosecute him with respect to the count in which he was charged with grand theft by false pretenses. He does not attack, on a jurisdictional basis, his conviction on the conspiracy charge. The requisite elements of grand theft by false pretenses are (1) knowingly making a false representation; (2) an intent to defraud; (3) an intent to permanently deprive the owner of property; and (4) reliance upon false pretenses by the victim. *State v. Mills*, 96 Ariz. 377, 396 P.2d 5 (1964); *State v. Joseph*, 20 Ariz.App. 70, 510 P.2d 69 (1973). Appellant states that Arizona has no jurisdiction over offenses committed outside of its territorial limits and cites *State v. Jacobs*, 93 Ariz. 336, 380 P.2d 998 (1963) and *State v. Scofield*, 7 Ariz.App. 307, 438 P.2d 776 (1968). In line with this generalized proposition of law, appellant asserts that all of the foregoing elements of grand theft by false pretenses in fact occurred in Indiana and therefore Arizona does not have jurisdiction to prosecute him on this charge. In this regard, appellant maintains that there is no reliable evidence that either he or Combined Equity received any money *in Arizona* from the Millers for the three lots at Concho Lakelands. In opposing appellant's contentions, the state maintains that appellant was subject to prosecution in Arizona because (1) his conduct constituted aiding and abetting the commission of the offense of grand theft through false pretenses thereby subjecting him to prosecution as a principal in Arizona; (2) the offense, although partially committed outside the state, was consummated in Arizona; and (3) property obtained outside the State of Arizona by means that amounted to theft within Arizona, was brought into the State of Arizona. The state further maintains that ample evidence was produced at trial to sustain its foregoing position with respect to jurisdiction. We agree.

We are of the firm opinion that Arizona has and did have jurisdiction to maintain a prosecution against appellant on the charge of grand theft by false pretenses. In *State v. Scofield, supra,* this court, in acknowledging the general proposition that Arizona does not have jurisdiction over offenses committed outside its territorial limits, also acknowledged the further proposition that if the requisite elements of the crime are committed in different jurisdictions, any state in which an essential part of the crime is committed may take jurisdiction. This is particularly true with respect to the state in which the crime is *consummated.* This judicial expression is in accord with legislatively established jurisdictional requirements. Former A.R.S. § 13–1502 (now in substantially the same form at A.R.S. § 13–108) expressly states:

§ 13–1502. Offense commenced out of state and consummated within

When the commission of a crime or public offense commenced without the state is consummated within the state, the defendant is liable to punishment in this state, though he was without the state at the time of the commission of the offense charged, if he *consummated* the offense through the intervention of an innocent or guilty agent, or by any other means proceeding directly from himself. [emphasis supplied]

■ In conjunction with the foregoing, when property obtained outside the State of Arizona, by means which would amount to theft within Arizona, is brought into the state, criminal liability will attach. Former A.R.S. § 13–112 expressly provided:

§ 13–112. Particular persons liable to punishment

The following persons are liable to punishment under the laws of this state:

. . . . .

2. Those who commit any offense without this state which, if committed within this state, would be *theft*, robbery

or theft by embezzlement under the laws of this state, and bring the property stolen or embezzled or any part of it into, or are found with it or any part of it within, this state. [emphasis supplied]

The cumulative effect and clear legislative intent of the foregoing statutes is to hold Arizona residents criminally accountable for offenses which in whole or in part are committed outside the state and to prevent such residents from realizing and enjoying their unlawfully obtained rewards within the State of Arizona all the while immune from prosecution.

■ Although appellant contends that all elements of grand theft by false pretenses were committed in Indiana and that the record is devoid of evidence that either he or Combined Equity received any of the money in Arizona from the Miller transaction in Indiana, the record affirmatively demonstrates otherwise. Admittedly, and as conceded by appellant, the fraudulent representations by appellant to the Millers took place in Indiana. At the same time, evidence in the record discloses that the Purchase and Sale Agreement signed by the Millers as a result of his fraudulent misrepresentations was mailed to Combined Equity in Arizona and was subsequently "accepted" in Arizona by an officer of Combined Equity. The record further demonstrates that the Millers' check for $4,543.08 was mailed from Indiana and was received and processed by Combined Equity in Arizona. It can only be concluded that the sales transaction was consummated in Arizona and that property (the Millers' funds) was brought into this state as a direct result of appellant's fraudulent misrepresentations in Indiana. This conduct and activity falls squarely within the jurisdictional predicates set forth in former A.R.S. §§ 13–112 and 13–1502. To determine otherwise and accept appellant's argument would make Arizona a sanctuarial base for land fraud operations. Arizona courts clearly had jurisdiction to prosecute appellant.

■ We are also of the opinion that the evidence established that appellant's activi-

ties without the State of Arizona aided and abetted other individuals (codefendants under the indictment) located in Arizona to participate in and partake of the proceeds of the grand theft alleged in the Miller transaction. Since those who aid and abet the commission of the crime may be prosecuted as if they were principals, the indictment, as drafted, was legally sufficient to charge appellant as an aider and abettor and therefore a principal. *See State v. Spillman,* 105 Ariz. 523, 468 P.2d 376 (1970). *See also* former A.R.S. §§ 13–113 and 13–140.

## CONDUCT OF THE TRIAL—LEADING QUESTIONS ON DIRECT EXAMINATION

■ Appellant next contends that the trial court committed reversible error by permitting the prosecutor on direct examination to propound a great number of leading questions. In this regard, he maintains that this constituted a violation of Rule 611(c) of the Rules of Evidence for Courts in the State of Arizona. This rule provides:

*Leading questions.* Leading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony. Ordinarily, leading questions should be permitted on cross-examination. A party may interrogate an unwilling, hostile or biased witness by leading questions. A party may call an adverse party or an officer, director, or managing agent of a public or private corporation or of a partnership or association which is an adverse party or a witness whose interests are identified with an adverse party and interrogate him by leading questions. The witness thus called may be interrogated by leading questions on behalf of the adverse party also.

In his brief, appellant has appended portions of the trial transcript which he maintains were wrongfully permitted "leading questions." Although it is desirable to develop one's own case without unduly resorting to the use of leading questions, the admonition is not absolute and it is within

the sound discretion of the trial court to determine whether to permit the asking of leading questions of one's witness. *State v. King,* 66 Ariz. 42, 182 P.2d 915 (1947); *State v. Godsoe,* 107 Ariz. 367, 489 P.2d 4 (1971); *Wackerman v. Wackerman,* 16 Ariz.App. 382, 493 P.2d 928 (1972). Attendant to the exercise of this discretion are considerations such as the complexity of the issues and facts, whether such questions are foundational in nature, or necessary to develop testimony. In the instant case, the issues of law and fact were complicated in nature, involving land fraud and securities fraud at a highly sophisticated and carefully developed level. The trial itself extended over one month and resulted in fourteen volumes of reported testimony with numerous and often involved written exhibits.

■ We have carefully reviewed the "leading questions" cited by appellant in the context of the testimony in which they were asked. Based upon this review, it is our conclusion that a very substantial majority of these questions were either not leading or fall within the category of being foundational in nature or were necessary to develop testimony in an understandable manner for the jury. The relative few "leading questions" which do not fall within one of these categories did not prejudice appellant. We are of the opinion that the trial court duly considered appellant's rights and exercised his discretion in a fair, objective manner in ruling upon objections to such questions.

## ALLEGED ERRORS OF PROSECUTOR, TRIAL COUNSEL AND TRIAL COURT

Appellate counsel in seeking to obtain a reversal has set forth a potpourri of claimed errors by the prosecutor, appellant's trial counsel and the trial court, the cumulative effect of which, he maintains, warrants a reversal. These claimed errors will be considered, although some approximate tongue-in-cheek assertions.

■ It is claimed that the trial court erred in failing to declare a mistrial when a prospective juror, during voir dire, made what is termed an "inflammatory remark." In response to general questions by the trial judge regarding the location of the subdivision property, the prospective juror (who did not serve on the jury) commented that the area up there was "desert." In the context of the entire lengthy trial proceedings and in view of the court's instructions to the jury panel that *only* evidence adduced in court could be considered by them in their deliberation, we are of the opinion that the possible prejudice from this singular remark by a venireman is too remote and speculative to support a finding of error. *United States v. Segovia,* 576 F.2d 251 (9th Cir. 1978); *cf., State v. Strong,* 119 Ohio App. 31, 196 N.E.2d 801 (1963).

■ Appellant also asserts that the trial court's rulings and permitted conduct during the trial evidenced a judicial bias against him. The rulings complained of relate to rulings on evidentiary issues in the jury's presence. The alleged erroneous conduct consists of the trial court permitting arguments by the prosecutor and appellant's trial counsel to take place in the jury's presence and permitting witnesses to read entire exhibits previously admitted into evidence. Realistically, it is extremely difficult, if not impossible, to maintain a constant antiseptic trial atmosphere and totally constrain opposing advocates when hotly contested evidentiary issues are presented. We have reviewed the specific instances complained of by counsel and are of the opinion that neither singularly nor cumulatively was the appellant prejudiced. More importantly, the record discloses that the trial judge kept a tight reign on counsel and no judicial bias against appellant is shown. Additionally, the record reflects that the court, prior to the beginning of trial and at its conclusion, properly instructed the jury that they could only consider the evidence properly admitted in determining appellant's guilt and that comments of the court or arguments of counsel were not such evidence and could not be considered by them. Similarly, there is no merit to appellant's complaint that the trial court's bias was demonstrated by allowing witness-

es to read to the jury from documentary exhibits admitted into evidence since this is a matter subject to the discretion of the trial court. From our review and study of the record, we conclude that the trial court did not abuse its discretion in this regard.

Appellant further asserts error by reason of the court's rulings permitting hearsay statements of the alleged co-conspirators and not allowing hearsay statements by appellant's witnesses. The hearsay statements which appellant sought to introduce through his witnesses were statements which appellant made to these witnesses approximately one year *after* Combined Equity was closed and approximately one year *after* termination of the conspiracy charged in the indictment. On the other hand, the permitted hearsay statements of co-conspirators who testified against appellant concerned statements made *during* the pendency and in furtherance of the alleged conspiracy. The statements by the alleged co-conspirators are specifically authorized by Rule 801(d)(2)(E), Rules of Evidence for Courts in the State of Arizona and traditional case law. *State v. Speerschneider*, 25 Ariz.App. 340, 543 P.2d 461 (1975).

Appellant contends that the hearsay statements that he sought to introduce through his witnesses were admissible as an exception to the hearsay rule pursuant to Rule 803(24) of the Rules of Evidence to demonstrate the extent of appellant's knowledge and his state of mind during the period of the alleged conspiracy offense. These statements related to conversations appellant had with a private attorney and another individual regarding the commencement of a class action lawsuit against former officers of Combined Equity and the corporation itself. The problem with appellant's argument is that the hearsay declarations that appellant sought to introduce through these witnesses were made approximately one year *after* termination of the charged conspiracy and more than a year *after* the alleged commission of grand theft through false pretenses with the Millers had taken place. In order to be admissible,

such statements must be made at or near the time of the event that forms the basis for the charge. *State v. Izzo,* 94 Ariz. 226, 383 P.2d 116 (1963); *see State v. Wallace,* 97 Ariz. 296, 399 P.2d 909 (1965). The statements were too remote to be admissible as a hearsay exception. Additionally, the trustworthiness of such statements is highly suspect because of their self-serving nature. The court did not err in denying their admissibility.

Appellant is also critical of the legal representation he received at trial. He asserts that his court-appointed counsel was not as aggressive as he should have been and committed judgmental error at trial by not calling some witnesses to testify on behalf of appellant. It is still the rule in Arizona that a defendant is not denied effective assistance of counsel unless the proceedings against him were reduced to a farce, sham or mockery of justice. *State v. Dippre,* 121 Ariz. 596, 592 P.2d 1252 (1979). Trial counsel's representation of appellant extended over a period of sixteen months without complaint from appellant. During this period of time, appellant's trial counsel engaged in numerous pre-trial motions on behalf of appellant even to the extent of bringing a special action before the Arizona Supreme Court. A review of the record belies appellant's present criticism of lack of aggressiveness of trial counsel. Additionally, trial counsel's decision not to call some of the witnesses purportedly requested by appellant to testify presents, at most, a disagreement between defense counsel and his client as to trial tactics and does not provide grounds for finding that counsel's representation was inadequate. *See State v. Workman,* 123 Ariz. 501, 600 P.2d 1133 (1979); *State v. Pietsch,* 109 Ariz. 261, 508 P.2d 337 (1973). Viewing trial counsel's representation in its entirety we are of the opinion that appellant was accorded effective assistance of counsel.

Appellant next contends that it was error to allow into evidence two exhibits that, he contends, were not disclosed to appellant or his counsel prior to the beginning of trial. The two exhibits consist of a

financial statement of appellant during 1973 and an application for credit with a statement of income for 1974. Both exhibits were used as impeachment and rebuttal evidence after appellant took the stand and refused, on cross examination, to disclose or even approximate his income while working for Combined Equity during those years. It is apparent from reading the transcript of testimony that utilization of these exhibits as rebuttal evidence was not indicated until after appellant had testified. It was within the discretion of the trial court to determine whether this constituted proper rebuttal evidence and in the absence of an apparent abuse of discretion, the trial court's action will not be reversed on appeal. *See State v. Young,* 116 Ariz. 385, 569 P.2d 815 (1977). In view of the manner in which the necessity for introduction of this rebuttal evidence arose, we are of the opinion that the trial court did not abuse its discretion in admitting these exhibits into evidence.

■ Appellant next contends that the trial court erred in allowing into evidence the guilty pleas of individuals who, along with appellant, had been subject to the extensive indictment returned against officers, employees and associates of Combined Equity. In line with this contention, appellant asserts that it was reversible error for the state to "draw the sting" by bringing to the jury's attention at the time that each of these state witnesses testified on direct examination the fact that such witness had entered a plea of guilty to a reduced criminal charge in exchange for an agreement to testify. Error was not committed. In Arizona, a party, whether it is the state or a defendant, is allowed to "draw the sting" of its own witness. Rule 607, Rules of Evidence for Courts in the State of Arizona. *See State v. Fleming,* 117 Ariz. 122, 571 P.2d 268 (1977).

Lastly, appellant contends that his constitutional rights were violated since he was not represented by counsel at the grand jury proceedings and was not provided a preliminary hearing. This contention has been expressly and repeatedly rejected by the appellate courts of this state. *State v. Bojorquez,* 111 Ariz. 549, 535 P.2d 6 (1975); *State v. Hinkle,* 26 Ariz.App. 561, 550 P.2d 115 (1976).

Judgment and sentence are affirmed.

WREN, P. J., and DONOFRIO, J., concur.