DECISION AND JUDGMENT ENTRY
This is an appeal from the judgment of the Lucas County Court of Common Pleas, following a jury trial, wherein defendant-appellant, John Siegman, was found guilty of four counts of rape of a minor under the age of thirteen, in violation of R.C. 2907.02(A)(1)(b), and four counts of gross sexual imposition, in violation of R.C. 2907.05(A)(4). In addition, the trial court determined that appellant was a sexually oriented offender under R.C. Chapter 2950. Appellant appeals that judgment and raises the following four assignments of error:
"Assignment of Error No. I:
 "The Trial Court Erred by Entering Judgment on a Verdict That Was Against the Manifest Weight of the Evidence, in Violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Article I, Section 10 of the Ohio Constitution.
"Assignment of Error No. II:
 "The Trial Court Erred by Permitting Jury Selection to Go Forward After The Panel Was Tainted by Extremely Prejudicial Statements Made by a Potential Juror During Voir Dire, in Violation of The Sixth and Fourteenth Amendments to The United States Constitution and Section 10, Article I, of The Ohio Constitution.
"Assignment of Error No. III:
 "Alternatively, it Was Plain Error for the Trial Court to Not Inquire of the Panel and Give a Cautionary Instruction after the Panel Was Tainted by Extremely Prejudicial Statement [sic] Made by a Prospective Juror During Voir Dire, in Violation of the Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I, of the Ohio Constitution.
"Assignment of Error No. IV:
 "In so far [sic] as Trial Counsel Failed to Preserve Any of These Issues for Appeal, the Defendant Was Denied the Effective Assistance of Counsel as Guaranteed by the Fifth, Sixth, and Fourteen [sic] Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution."
On December 20, 2000, appellant was indicted by the Lucas County Grand Jury on four counts of rape of a minor under the age of thirteen, in violation of R.C. 2907.02(A)(1)(b), a first degree felony. Appellant was also indicted on four counts of gross sexual imposition, in violation of R.C. 2907.05(A)(4), a third degree felony. The counts alleged that the rapes and acts of gross sexual imposition occurred between May 26, 1997 and January 1, 1999. Appellant entered a plea of not guilty.
The case proceeded to trial on May 7, 2001, and the following testimony was presented. The alleged victim, Kimberly B., testified that she lived with her mother, two younger sisters and four older brothers[1] in Toledo, Lucas County, Ohio. She stated that appellant, then her mother's boyfriend, moved into the house in 1996 or 1997 when she was in fourth or fifth grade. His daughter, a few years younger than Kimberly, also moved in with them. At first, the four girls shared one of the three bedrooms.
Kimberly testified that the first incident took place in her mother's bedroom while she was at work. Appellant began rubbing her thighs and breasts and then began to fondle her vagina. Kimberly got up and walked away. She stated that appellant continued to fondle her three or four times a week for a few years. Kimberly testified that the incidents occurred in her room, her mother's room, or on the couch in the living room. Kimberly stated that she did not tell anyone about the incidents because she was scared.
Kimberly testified that she was in her bedroom when appellant "tried to put it in [her]" and that it hurt. The next incident occurred in her mother's room and Kimberly stated that: "He had put it all the way in me." Kimberly testified that it happened three or four additional times.
In January 1999, appellant and his daughter moved out of the house. They were gone approximately a year and one-half and then moved back into the home. Kimberly testified that when they moved out she did not tell anyone about the incidents because she believed she would never see appellant again and she could just put it out of her mind.
Kimberly testified that in August 2000, just a few days after appellant moved back into the home, she was sleeping on the couch and appellant put his hand in her pants and touched her vagina. The next day Kimberly left the house to stay with her brother, Richard.
The day after Kimberly left the house, she told her brother, Richard, and her mother that appellant had been "messing" with her. Kimberly testified that her mother did not believe her at first, but that after she told her brother, John, and he confronted appellant and made him leave, her mother telephoned the police.
Kimberly stated that she told the police only that appellant had been fondling her, not that he had had intercourse with her. Kimberly testified that she did not believe that telling them all the facts would have made much of a difference. Further, when asked by the officers, Kimberly admitted that she denied being penetrated by appellant, but claimed that she had not known exactly what penetration meant. Kimberly was later interviewed by a Children's Services Board ("CSB") caseworker with whom she relayed the entirety of what had happened.
Kimberly's mother, Caroline B., next testified. Caroline testified that she and appellant met through their daughters. The relationship began in October 1995, and appellant and his daughter moved into the house in January 1996.
Caroline testified that in August 1996, she began driving a taxi during the day shift. In February 1997, she began working the night shift which was approximately 5:00 p.m. until 3:00 or 4:00 a.m. Caroline stated that when things were slow she would often be home during work hours to check on things.
A few years after she began driving the taxi, the relationship between she and appellant changed. Caroline testified that appellant began drinking a lot more, was depressed, and was using marijuana. In January 1999, he and his daughter moved out of the house.
Caroline testified that in August 2000, appellant was in the process of getting evicted from his apartment and his utilities had been shut off so she allowed him to move back into the house. Caroline testified that when appellant moved back into the home, Kimberly would "freeze up" every time his name was mentioned. Caroline thought that the main problem was that Kimberly did not like sharing a room with appellant's daughter.
Caroline stated that after her daughter alleged that appellant "messed" with her, Caroline asked appellant if the allegations were true. According to Caroline, appellant indicated that he did not remember touching Kimberly inappropriately but that something may have "happened when he was drinking that he had blocked out." Once Kimberly told her brother, John, that appellant had raped her, Caroline called the police.
Richard Q., Kimberly's oldest brother, testified next. Richard indicated that in August 2000, Kimberly moved into his apartment and stayed until appellant moved out of the house. According to Richard, Kimberly had been acting very moody and "strange."
John Q., Kimberly's next oldest brother, testified that in mid-1998 until about March 2001, he lived about six houses away from his mother's house. John indicated that, though he was not aware of the date, Kimberly went to his house to tell him about what appellant had done to her. John went to appellant and told him he had to leave and began shoving appellant towards his car. According to John, though he had not accused appellant of anything, appellant indicated that it is not how you think.
Toledo Police Officer Carole Scherer responded to the sexual assault report with her partner Officer Bonnie Coombs. Scherer testified that when they responded, Kimberly appeared to be nervous and teary eyed. The officers took Kimberly aside and spoke with her for approximately one-half hour. Officer Scherer asked Kimberly if there had been penetration. Scherer explained that penetration meant that appellant put his penis inside her. Kimberly responded negatively.
Toledo Police Detective Paul Tetuan was the officer assigned to investigate the allegations made by Kimberly. Because the case involved a minor and household member, Toledo Police and CSB were to do a co-investigation.
Tetuan testified that on September 20, 2000, he and the CSB caseworker had scheduled a joint interview with Kimberly. Tetuan was unable to attend, however, and the caseworker conducted the interview alone. Tetuan did review the caseworker's information and received a copy of the report.
Tetuan conducted an interview of appellant on October 11, 2000. According to Tetuan, appellant denied touching Kimberly but did state that on occasion he would get quite drunk and that he may have done something to Kimberly but he did not recall. Tetuan did state that appellant voluntarily came to the police station to speak with him and he was very cooperative.
Appellant's daughter, Suzette, testified on appellant's behalf. She stated that Kimberly did not like appellant very much because "he would put his foot down, wouldn't let her have her own way."
Following jury deliberations, appellant was found guilty of all eight counts of the indictment. On May 30, 2001, appellant was sentenced to a sixteen-year prison term. This appeal followed.
In appellant's first assignment of error he contends that his convictions for rape and gross sexual imposition were against the manifest weight of the evidence. In State v. Thompkins (1997),78 Ohio St.3d 380, 386, the Ohio Supreme Court stated that the "legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." The court explained that while an appellate court may determine that a judgment is sustained by sufficient evidence, it may still conclude that the judgment is against the weight of the evidence. (Citation omitted.) Id. At 387.
In contrast to sufficiency, the court stated the following in regard to weight of the evidence:
"Weight of the evidence concerns `the inclination of the greater amountof credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amountof credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effectin inducing belief.'" (Citation omitted.) (Emphasis in original.) Id. at 387.
The Ohio Supreme Court also noted that when an appellate court reverses a verdict as against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and "disagrees with the factfinder's resolution of the conflicting testimony." Id. In reviewing the entire record, an appellate court:
 "`weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" Id., quoting State v. Martin (1983), 20 Ohio App.3d 172, 175.
Appellant contends that the only evidence of the alleged rapes and acts of gross sexual imposition was the uncorroborated testimony of Kimberly. Further, her testimony was inconsistent and, because Kimberly did not like appellant and his daughter living with them, she had a motive to lie.
After careful review of the record in this case we are unpersuaded by appellant's contention that the jury's verdict was against the manifest weight of the evidence. The jury in this case was in the best position to observe the witnesses and make credibility determinations. We cannot say that in making such credibility determinations the jury clearly lost its way. Accordingly, appellant's first assignment of error is not well-taken.
In appellant's second assignment of error, he contends that he was denied his constitutional guarantee to an impartial jury. During voir dire, Toledo Police Officer Murphy was questioned as a potential juror as follows:
 "THE COURT: It's Officer Murphy. And you know the individuals here, you know the type of case that we have?
"MR. MURPHY: Yes.
 "THE COURT: The real question here is, is this the type of case that you could keep an open mind about? Do you think that you would be more comfortable handling a civil matter?
 "MR. MURPHY: Well, I look at the defendant, and I have my prejudiced opinion about him already because of my background and I —
 "THE COURT: Then we're going to allow you to be excused, and we're going to find — we hope there may be a civil case that you could be seated on. Appreciate your being here."
Following the above exchange, appellant's counsel requested that the jury pool be dismissed because the officer's statements may have "tainted" the jurors. The request was overruled. Shortly thereafter, the court addressed the venire stating:
 "Members of the jury, we also know we are attempting to get a fair and impartial jury. We want people to put aside any preconceived notions that they have and listen to this case with a totally open mind. That is why we're undergoing this process. Is everybody understanding what we're doing here?
Okay. Good."
The purpose of voir dire is to empanel a fair and impartial jury; a jury free from prejudice or bias. State v. Twyford, 94 Ohio St.3d 340,2002-Ohio-894; State v. Crago (1994), 93 Ohio App.3d 621, 641. The determination of issues which arise during voir dire are within the trial court's discretion and no prejudicial error can be assigned absent a clear abuse of that discretion. State v. Beuke (1988), 38 Ohio St.3d 29,39.
In support of his argument that his right to an impartial jury was violated, appellant cites State v. Strong (1963), 119 Ohio App. 31. InStrong, a capital murder case, a prospective juror stated that she usually did not believe in capital punishment but in the present case she did. The juror explained herself stating that: "This man, he killed two people and — * * * a dog." Id. at 33. The Fifth Appellate District found that even with the cautionary instruction by the court, failure to protect the defendant from that kind of "courtroom atmosphere" was erroneous and prejudicial. Id. at 34.
Appellant distinguishes the facts of the present case with those inState v. Phillips (May 10, 1996), 6th Dist. No. L-95-257. In Phillips, one of the prospective jurors was a sheriff's deputy who had escorted the defendant to and from the county jail and courthouse on several occasions. One of the subsequent prospective jurors indicated that he could not presume that the defendant was innocent based upon that fact. The trial court explained that the deputy had escorted the defendant on matters pertaining only to the instant case. Thereafter, the deputy was dismissed.
Rejecting the appellant's assignment of error, this court explained:
 "The record shows that the court conducted a thorough voir dire examination. Each of the prospective jurors who remained on the panel for trial assured the court they would decide the case based on the evidence." Id.
In the present case, the trial court, immediately following the exchange with Officer Murphy, stressed to the venire that the purpose of voir dire is to obtain a fair and impartial jury. Further, defense counsel, at the outset of his voir dire examination, stressed the importance of the presumption of innocence and inquired of the venire as to their acceptance of the presumption. Accordingly, we find that the trial court did not err in refusing to dismiss the jury panel. Appellant's second assignment of error is not well-taken.
Appellant's third assignment of error alternatively asserts that even if we reject the argument that Officer Murphy's remarks warranted dismissal of the jury panel, nevertheless, it was plain error for the trial court not to specifically instruct the jury to disregard Murphy's statements.
Crim.R. 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Notice of plain error must be taken with the utmost caution, under exceptional circumstances, and only in order to prevent a manifest miscarriage of justice. State v. Long (1978),53 Ohio St.2d 91, paragraph three of the syllabus. In order to succeed on a plain error claim, an appellant must demonstrate that but for the errors he alleges, the outcome of the trial would clearly have been different. See State v. Waddell (1996), 75 Ohio St.3d 163, 166.
In support of his argument that the trial court's failure to specifically instruct the jury as to Officer Murphy's remarks was plain error, appellant asserts that every intermediate court that has permitted a jury panel to go forward following a prospective juror's prejudicial remarks has required that a cautionary instruction be given. In support of this assertion, appellant relies on State v. Moore (July 14, 1992), 10th Dist. No. 91AP-1256, and State v. McCoffin (Oct. 22, 1992),
10th Dist. No. 91AP-1233. Moore and McCoffin were codefendants charged with multiple counts of rape and tried before the same jury. During voir dire, a penal system food service worker expressed strong negative opinions about rapists and where they ranked within the hierarchy of imprisoned felons. After excusing the juror, the court inquired as to whether the food service worker's comments had prejudiced the jury and admonished the jury not to consider the prejudicial remarks.
In response, the state has cited two cases where no cautionary instructions were necessary; the cases are State v. Phillips (May 10, 1996), L-95-257, discussed above, and State v. Hanning (Dec. 4, 1992), 5th Dist. No. CA 92-17. In Hanning, the defendant was charged with aggravated menacing. A prospective juror was questioned and responded as follows:
 "MR. KAIDO: Do you have any problem, or does anybody have any personal — personal matters that are such that they weigh on your mind to the extent you simply don't want to serve as a juror? Yes, ma'am?
 "BRENDA CLARK: I've had a previous conflict with Mr. Hanning on Maple Avenue, and it's very questionable whether I'd be —
 "MR. KAIDO: Any you stating that you recognize Mr. Hanning and know him?
 "BRENDA CLARK: Yes. You asked personally. I should have raised my hand. I don't know him personally, but through a prior conflict, I know who he is."
Thereafter, the juror was excused and no other action was requested or taken regarding the comments. The appellate court found no plain error in not declaring a mistrial because the "conflict" mentioned by the juror was not specific enough to show that it was similar to the offense charged, that it involved a criminal act, or that the juror was hostile toward appellant.
In the present case, we cannot say that the trial court's failure to issue a cautionary instruction following Officer Murphy's comments definitely affected the outcome of the trial. As stated above, following the dismissal of Officer Murphy the trial court again instructed the venire as to the purpose of voir dire and that any preconceived notions must be set aside. Thus, we find that appellant's third assignment of error is not well-taken.
In appellant's fourth and final assignment of error, he argues that trial counsel's failure to request a cautionary instruction, based on Officer Murphy's comments, amounted to ineffective assistance of counsel.
Legal representation is constitutionally ineffective, and a basis for reversal or vacation of a conviction, when counsel's performance is deficient and results in prejudice to the accused. Strickland v.Washington (1984), 466 U.S. 668. In order to prove ineffective assistance of counsel, a defendant must show (1) that his counsel's performance fell below an objective standard of reasonable representation in some particular respect or respects and (2) that he was so prejudiced by the defect or defects that there exists a reasonable probability that, but for counsel's errors, the result of the trial would have been different. State v. Bradley (1989), 42 Ohio St.3d 136, paragraphs two and three of the syllabus, following Strickland. In Ohio, a properly licensed attorney is presumed competent, and the burden is on the appellant to show counsel's ineffectiveness. State v. Lytle (1976),48 Ohio St.2d 391, 397; State v. Hamblin (1988), 37 Ohio St.3d 153,155-156.
Following Officer Murphy's comments, trial counsel immediately approached the bench and requested that the venire be dismissed. The request was denied. Thereafter, counsel directed a number of questions to the jury panel regarding appellant's ability to receive a fair and impartial trial. Upon review, we cannot say that appellant's trial counsel was ineffective as defined in Strickland, supra, and followed inBradley, supra. We find that even if appellant's trial counsel had requested a cautionary instruction, no reasonable probability exists that the outcome of the trial would have been different. Accordingly, appellant's fourth assignment of error is not well-taken.
On consideration whereof, we find that appellant was not prejudiced or prevented from having a fair trial and the judgment of the Lucas County Court of Common Pleas is affirmed. Costs of this appeal are assessed to appellant.
JUDGMENT AFFIRMED.
Peter M. Handwork, J., Richard W. Knepper, J., and Mark L.Pietrykowski, P.J., CONCUR.
[1] During the dates set forth in the indictments, two of her brothers lived at her mother's home and independently at various times.